This is a suit by a real estate agent for a commission alleged to be due him as the result of the sale of property by defendant. From a judgment in favor of plaintiff, defendant has appealed.
On May 3, 1940, defendant Wm. E. Thornhill, entered into a written contract with plaintiff, Doll, under which he employed the said Doll as exclusive agent for the sale of the property known as No. 8015 Orpheus Court in New Orleans. The contract, among other stipulations, contained the following:
"I employ you or your successors, exclusively, to sell same for $3700.00 * * * or for any other price, or terms hereafter agreed upon, and I agree to pay you or your successors, a commission at the regular rate of 4 per cent * * * on the gross amount of any agreement to sell or exchange bearing on said property made during the existence of this contract."
"* * * In case of employment of counsel to enforce this contract, I will pay 10% additional as attorney's fees, also all costs."
"As you are to act upon the faith of this employment and contract, it is to remain in full force and effect for a period of six months."
"I agree to refer all applicants to you, and not to interfere in the sale of said property during the term of this contract."
Doll or his employees placed the usual sign upon the said property, and on at least five occasions inserted in the local newspapers "For Sale" advertisements of the said property.
On May 13, 1940, V.E. Foy exhibited interest in the property, and through plaintiff made a written offer to exchange for it certain other real estate belonging to him. This offer was rejected and apparently no other prospects were produced directly by the Doll office.
However, during September, 1940, John M. Foy, brother of V.E. Foy, the former having moved next door to the property in question, called the said property to the attention of his brother-in-law, B.O. Bankston, who later purchased it directly from Thornhill. There is in the record nothing which shows that there was any connection whatever between the activity of Mr. *Page 794 
Doll's office in exhibiting the property to V.E. Foy and the subsequent purchase by Mr. Bankston, brother-in-law of J.M. Foy.
Bankston exhibited interest in the property by entering into direct negotiations with Thornhill. This was in September. The contract between Doll and Thornhill was still in force — was not to expire in fact until November 3d, and yet Thornhill did not refer Bankston to his agent, Doll, who contends he should have done so because of the quoted provision in the contract "to refer all applicants" to the said agent. During September, Bankston and Thornhill, by direct negotiations, without the intervention or assistance of Doll, reached a verbal agreement to the effect that if, during the term of the contract, Doll did not produce a purchaser who would buy at a price satisfactory to Thornhill, Bankston, after the expiration of the agency contract, would purchase the property for $3,150.
When the contract expired, Doll had not produced a purchaser. Shortly thereafter, on November 22, 1940, Thornhill sold the property to Bankston through the customary homestead association sale and resale. It is the contention of Doll that he is entitled to his commission of 4% stipulated in the contract, and the arguments made in support of this claim are —
1. That, as a matter of fact, the agreement between Thornhill and Bankston was, in effect, the result of a conspiracy, the purpose of which was to deprive Doll of his commission;
2. That even if there was no conspiracy, and even if the agreement was made under the bona fide belief that Thornhill was within his legal right in making the tentative agreement with Bankston, which would not be effective until and unless the Doll contract should expire without a purchaser having been produced, still the commission is due because the agency contract makes liability therefor depend not on whether a sale is consummated during the term of the contract, but on whether "any agreement to sell" is made during that term, the argument being that even the tentative agreement between Thornhill and Bankston, being an "agreement to sell", created in Thornhill the obligation to pay the commission; and
3. That, in any event, Doll is entitled to his commission because it was the duty of Thornhill under the contract to "refer all applicants" to him.
The argument in support of this last contention is that had Thornhill complied with this stipulation, Doll would have negotiated the sale and would have actually earned the commission.
On behalf of Thornhill it is contended that had the applicant been referred to Doll, no sale would have resulted because the deduction of the agent's commission from the maximum price at which Bankston could have bought would have produced a net figure under the minimum price which Thornhill would have accepted. Thornhill also argues that he did nothing whatever to interfere with the efforts of Doll to find a purchaser; that Doll did not produce Bankston and that since Bankston could not have purchased through Doll, Thornhill was justified in making a contingent contract with him to be effective only if and when the Doll contract should expire.
In his attempt to prove that Bankston could not have purchased had it been necessary that an agent's commission be added, Thornhill introduced evidence to the effect that the minimum price which he would accept was $3,150 net, and also to the effect that Bankston had only $450 in cash, and that the maximum homestead loan available was $2,700. From these figures his counsel maintains that it is obvious that if the commission of $126 had been added, the deal could not have been consummated.
There is much in the record to indicate that there must have been something more than a tentative agreement between Thornhill and Bankston, and whatever agreement there was, was entered into long prior to the expiration of the Doll contract. As early as September 21, 1940, Bankston applied to the Dixie Homestead Association for a loan on the Thornhill property. In connection with that application, Bankston made the usual deposit to cover the cost of an appraisement. This application was rejected because he desired $2,700, and the homestead was not willing to lend that much. On September 30, 1940, Bankston made another loan application, this time to the Pelican Homestead Association, and this application was approved. The title was examined by the attorneys of the Association, and in fact the usual mortgage and conveyance certificates were applied for long prior to the expiration of the Doll contract. It is true that Bankston says that he had asked that the certificates *Page 795 
be delayed until the contract should become effective, but all of these circumstances seem to indicate that all parties involved treated the Thornhill-Bankston Agreement as something more than a mere contingent understanding.
To show the light in which Thornhill looked upon the Bankston agreement, we refer to the fact that shortly after the so-called tentative agreement was made, Thornhill, without telling Doll of the agreement, attempted to have Doll agree to an immediate cancellation of the agency contract. When Doll refused to agree to this cancellation, Thornhill, on October 1, 1940, wrote Doll a letter, notifying him that the agency contract would expire on November 3, 1940. In that letter he also wrote "* * * I have decided, at least for the present, to reside at the aforementioned address."
The writing of this letter must be looked upon with suspicion. In the first place there was not the slightest necessity for notifying Doll that the contract would expire on November 3d, since the contract, itself, so stated, and in the second place, the statement that Thornhill intended to reside in the property was obviously false and was apparently made to throw Doll off his guard, because at that time there is no dispute about the fact that Thornhill had agreed to sell the property to Bankston if Doll did not sell it to someone else. Thus, under no circumstances could Thornhill have occupied the house himself for, if Doll sold it to a third person, that third person would have occupied or controlled it, and if Doll did not sell it, then Bankston had contracted to take it. And that Thornhill did not intend to occupy it is further evidenced by the fact that shortly after the letter was written, Thornhill and Bankston entered into a lease arrangement, under which Bankston moved into the house to occupy it as a tenant until the act of sale to him could be passed.
But above and beyond all of these facts we find that Thornhill clearly violated the plain provisions of his contract in not referring Bankston to Doll as soon as the former evidenced any interest in the property. It will not do for him to say that had he done so, no sale would have resulted. A real estate agent is supposedly an expert in his business, and we must presume that he could have accomplished what Thornhill accomplished, or that he could have persuaded one of the parties to recede sufficiently from his position for the consummation of a trade. At any rate, he was entitled to the opportunity to try. To uphold the contention made here by Thornhill would establish a dangerous rule and would open the door in many cases to the perpetration of fraud upon agents who conscientiously try to carry out their mandates.
Furthermore, it is entirely possible that the efforts of Doll may have been responsible for the initial interest on the part of Bankston. Who can tell that the sign which he placed on the property, or that the newspaper advertisements inserted and paid for by him, may not have been responsible for the interest displayed by V.E. Foy or how can we know that V.E. Foy, after himself losing interest, may not have interested his brother, and, through his brother, Bankston?
But all of these questions need not be gone into. A real estate agent, who has an exclusive contract and who under it has done what he could to sell the property, need not show that it was actually through his efforts that a purchaser was produced.
Counsel for defendant urges us to accept it as fact that nothing that Thornhill did interfered in any way with the success of Doll in finding a purchaser, and he argues that since there was no such interference, the rule of law which should be applied is that which was followed in Clesi v. Cooney, 164 La. 657,114 So. 584, in which the Supreme Court refused to plaintiff, a real estate agent, a judgment on the face of the pleadings, when the defendant admitted that during the existence of the broker's exclusive contract, he had entered directly into a contingent contract with a third person to sell the property, after the termination of the agent's contract.
But from that contract there was absent the stipulation which is present here and which is all important, and that is that the owner should not have the right to trade directly and independently with prospective purchasers, which is certainly the effect of the contractual provision that all prospects should be referred to the agent. That the Supreme Court considered this distinction of the utmost importance becomes evident from a reading of the decision in Alex F. Dreyfus Co. v. Friedman,171 La. 90, 129 So. 679. In the contract which was involved there, there was a stipulation that the owner should "refer all applicants to *Page 796 
the agent" and that the owner was "not to interfere in the sale of the property during the term of the contract." It was argued that the facts brought the case within the doctrine of O'Neal v. Southland Lumber Co., Inc., 168 La. 235, 121 So. 755, in which as in Clesi v. Cooney, supra, the court had held that there could be no recovery since there had been no interference by the owner with the opportunity of the agent to effect the sale. But the Supreme Court held that though to some extent the cases were similar, the Clesi case and the O'Neal case differed from the Dreyfus case in an important particular, to-wit, that by the contract the owner, "Mrs. Friedman" was required "to refer all applicants for the purchase of the property to the agent."
Nor can that stipulation be looked upon as unimportant or as one which the owner might overlook, for immediately after the signing of the contract, his attention was called to it in a letter in which the agent thanked him for employing him and said to him that his attention was called to the fact that all applicants should be referred to the agent. For these reasons when Thornhill dealt directly with Bankston, and did not refer him to the plaintiff, he breached the contract, and later when he directly made the sale to Bankston, he made himself liable to Doll for the stipulated commission. Since legal services have been necessary to vindicate the rights of Doll, he is also liable for the attorney's fees provided for in the contract.
The judgment appealed from is affirmed at the cost of defendant.
Affirmed.
SIMON, J., takes no part.